UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
UNITED STATES OF AMERICA,            :

        -v.-                          :
                                      :
JAVIER JOAQUIN ALARCON PRADO, LUIS    :        15-cr-455 (JSR)
ARMANDO VALENCIA BAUTISTA, and HECTOR :
VALENCIA BAUTISTA,                    :        OPINION AND ORDER
                                      :
               Defendants.            :
------------------------------------- x

JED S. RAKOFF, U.S.D.J.

        Defendants Javier Joaquin Alarcon Prado, Luis Armando Valencia
Bautista, and Hector Valencia Bautista were detained by the United
States Coast Guard several hundred miles off the coast of South
America. They were travelling in a small boat, known as a go-fast,
that contained over 600 kilograms of cocaine. The Government charged
defendants with conspiracy to possess with intent to distribute
cocaine aboard a vessel subject to the jurisdiction of the United
States, in violation of the Maritime Drug Law Enforcement Act
("MDLEA"), 46 U.S.C. §§ 70501-07, and possession with intent to
distribute cocaine aboard a vessel subject to the jurisdiction of the
United States, also in violation of the MDLEA, id.. Defendants have
moved to dismiss all charges on statutory and constitutional grounds,
to suppress their post-arrest statements, and to sanction the
Government for spoliation of evidence. Having received full written
briefing and factual submissions and heard oral argument, the Court
denies the motions, except the motion to suppress post-arrest
statements, as to which an evidentiary hearing is required.

By way of background, defendants are Ecuadorian, and the parties
agree that they were not travelling to or from the United States. The
Coast Guard interdicted their go-fast on June 19, 2015, approximately
two hundred and eighty miles from the coasts of Ecuador and Costa
Rica. The video footage of the interdiction (submitted to the Court)
shows that their boat lacked any prominent identifying features.
However, a small emblem of what appears to be an Ecuadorian flag had
been affixed to the boat's rear starboard side.

After stopping and boarding the go-fast, Coast Guard members
detained the three defendants. The defendants identified themselves,
but not their boat, as Ecuadorian. Although defendants claim that
Hector Valencia Bautista was the captain, see Declaration of Julia L.
Gatto, dated Sept. 11, 2015 ("Gatto Decl."), Ex. A ¶ 16, ECF No. 23,
they do not dispute that neither Hector Bautista nor either of the
other defendants identified himself at the time as the captain of the
go-fast, see Government's Omnibus Memorandum of Law in Opposition to
Defendant's Motions to Dismiss the Indictment and Suppress Post-Arrest
Statements ("Gov. Opp."), Ex. B at 4, ECF No. 27. The Coast Guard
members searched the go-fast and, while they did not locate any
registration papers, they recovered approximately 680 kilograms of
cocaine. Upon completing their search, the Coast Guard concluded that
the go-fast posed a navigation hazard and sank it.

The Coast Guard transported defendants from the Pacific Ocean to
New York City, where they arrived on July 1, 2015. The parties dispute
the circumstances of defendants' transportation: defendants claim they

were treated harshly, while the Government claims that the Coast Guard
adequately cared for them. Upon their arrival in New York City,
defendants were arrested and taken to the New York City Police
Department's 50th Precinct. At the Precinct, the defendants signed
written *Miranda* waivers before making inculpatory statements.

Constitutional Challenges: Defendants raise two constitutional
challenges to the indictment. First, defendants claim that applying
the MDLEA extraterritorially would on the facts of their case
unconstitutionally extend Congress's power to regulate maritime
conduct. Article I, Section 8, Clause 10 of the Constitution gives
Congress the power "[t]o define and punish Piracies and Felonies
committed on the high seas." The Second Circuit, in the context of the
Death on the High Seas Act ("DOHSA"), has defined the "high seas" to
mean those waters outside of the territorial waters of any state. See
In In re: Air Crash Off Long Island, New York, on July 17, 1996, 209
F.3d 200 (2d Cir. 2000).

The parties do not dispute that defendants were interdicted
outside any country's territorial waters. Instead, defendants argue
that the high seas only begin beyond any nation's Exclusive Economic
Zone ("EEZ"), which extends two hundred miles seaward of a nation's
territorial waters. See 33 C.F.R. § 2.32(d). The Court need not reach
this question, however, because defendants were interdicted beyond
even an EEZ. The closest landmass, the Costa Rican Isle de Coca, sits
two hundred and forty-eight miles from where the Coast Guard
interdicted the defendants. Thus, even if the Court used defendants'

3

definition, defendants were still sailing the high seas upon their interdiction.

Defendants also argue that their prosecution violates the Due Process Clause of the Fifth Amendment. "[I]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003) (quoting United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)). Defendants argue that no such nexus exists in this case. Although the Government concedes that the defendants were not going to the United States, see Transcript of Oral Argument dated Oct. 5, 2015, at 12:1-3, the Government argues that a nexus nonetheless exists because of a Congressional finding that "trafficking in controlled substances aboard vessels . . . presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501. In the Court's view, this finding, on its own, is insufficient to satisfy Yousef's nexus test. Were it sufficient, Congress could evade the nexus requirement by simply proclaiming that any conduct anywhere in the world that is contrary to American values threatens our "societal well-being."

In the alternative, however, the Government argues that the Court need not apply Yousef's nexus test because defendants' vessel was stateless. The Second Circuit has repeatedly made clear that "stateless vessels on the high seas are, by virtue of their

4

statelessness, subject to the jurisdiction of the United States . . .
even absent proof that the vessel's operators intended to distribute
their cargo in the United States." United States v. Henriquez, 731
F.2d 131, 134 (2d Cir. 1984) (quoting United States v. Pinto-Mejia,
720 F.2d 248, 260-61 (2d Cir. 1983)). The reasoning behind the
jurisdictional holdings of Henriquez and Pinto-Mejia also informs, and
in a sense modifies, Yousef's due process nexus requirement in the
case of stateless vessels. The "ultimate question" of the Due Process
Clause analysis is "would application of the statute to the defendant
be arbitrary or fundamentally unfair?" United States v. Davis, 905
F.2d 245, 249 n.2 (9th Cir. 1990). It is well-settled that "[v]essels
without nationality are international pariahs," and those aboard
stateless vessels lack the protections of any country's law. United
States v. Pinto-Mejia, 720 F.2d 248, 261 (2d Cir. 1983) (quoting
United States v. Marino-Garcia, 679 F.2d 1373, 1382 (11th Cir. 1982)).
It is not arbitrary or fundamentally unfair to prosecute those who
have renounced the legal world and "constitute a potential threat to
the order and stability of navigation on the high seas." Id.

An additional aspect of fundamental fairness, notice, further
supports this conclusion. "Fair warning does not require that the
defendants understand that they could be subject to criminal
prosecution in the United States so long as they would reasonably
understand that their conduct was criminal and would subject them to
prosecution somewhere." United States v. Al Kassar, 660 F.3d 108, 119
(2d Cir. 2011). Drug trafficking is "universally condemned," 46 U.S.C.

5

§ 70501, and criminalized not only in the U.S. but also in Ecuador, see Gatto Decl. Ex. G. Defendants were properly on notice that they might be prosecuted.

Defendants protest that they do not fall into any exception to Yousef because their boat was not constitutionally stateless. In this respect, international law, while not a perfect guide, see United States v. Davis, 905 F.2d 245, 249 n.2 (9th Cir. 1990), is the best guide to determine statelessness as a constitutional matter. Statelessness under international law follows from a vessel's lack of registration with any country. Article 91 of the United Nations Convention on the Law of the Seas ("UNCOLS"), as well as Article 5 of its predecessor, the United Nations Convention on the High Seas, provide that

> Every State shall fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag. Ships have the nationality of the State whose flag they are entitled to fly.
> . . .
> Every State shall issue to ships to which it has granted the right to fly its flag documents to that effect.

UNCOLS, Dec. 10, 1982, 1833 U.N.T.S. 397; see United Nations Convention on the High Seas, Apr. 29, 1958, 450 U.N.T.S. 11. The Government asserts, and defendants do not dispute, that the Coast Guard Members conducted a search of the go-fast and did not find any registration documents. See Gov. Opp. at 11, Ex. B at 4.[1] Moreover, as

---

[1] One of the defendants now alleges that "[b]oats properly registered with Ecuador typically have proof-of-registration papers," but he concedes that he never saw or located any such papers on the go-fast. See Gatto Decl. Ex. A ¶ 21.

evidenced by the videos and photos submitted to the Court, the go-fast had minimal, if any, identifying features. Attempting to trace the vessel back to any possible documents on land would therefore have been a futile exercise, since there was no meaningful identifying information that could be provided to the Ecuadorian authorities.[2] See Gatto Decl. Ex. C; Gov. Opp. Ex. C., Ex. E. All of this indicates, and the Court finds, that defendants' boat was unregistered and therefore stateless as a matter of international and constitutional law.

Statutory Challenges: Defendants also argue that the Indictment must be dismissed on statutory grounds. The MDLEA extends to "vessel[s] without nationality." 46 U.S.C. § 70502(c)(1)(A). "A claim of nationality or registry under this section includes only" possession of registration documents aboard the vessel, flying a nation's flag, or a verbal claim by the person in charge of the vessel. Id. § 70502(e).

Defendants failed to raise a claim of nationality or registry under any of § 70502(e)'s three provisions. Section 70502(e)(1) requires valid registry documents under Article 5 of the 1958 Convention on the High Seas. The Court has already concluded that there is no evidence that such documents existed aboard the vessel.

It is undisputed that no person in charge of the vessel, or indeed any of the defendants, made a verbal claim of the nationality

---

[2] Defendants claim that there was an Ecuadorian registration number, or "matricula," painted on the go-fast's side. Gatto Decl. Ex. A ¶ 20. These numbers are not visible in the videos or photographs of the boat submitted to the Court. See Gatto Decl. Ex. C; Gov. Opp. Ex. C., Ex. E.

of the vessel. § 70502(d)(1)(B) could be read to require the boarding agents to specifically request such a claim, and defendants deny that a request was made. Gatto Decl. Ex. A ¶¶ 16, 22. But quite aside from the fact that the Court does not read § 70502(d)(1)(B) as mandating such a specific inquiry, defendants do not dispute that general inquiries were made, such as to defendants' nationalities, so that, under all the facts and circumstances, defendants had every reasonable opportunity, and every good reason, to make a claim of vessel nationality, but failed to do so.[3] See Gov. Opp. Ex. 4.

Defendants claim, however, that they satisfied § 50702(e)(3) because they identified themselves as Ecuadorian. Defendants ask the Court to read § 50702(e)(3), which requires "a verbal claim of nationality or registry by the master or individual in charge of the vessel," as allowing a claim of a captain's nationality to serve as a claim of nationality for a boat. The Court finds no support for this reading in the text of the statute, which does not mention the nationality of a master or individual in charge of a boat. In § 50702(d)(1)(B), the operative provision of the statute's definition of a "vessel without nationality" for this case, the statute does spell out that it is a "claim of nationality or registry for [the] vessel" that matters. This is consistent with the purpose of the statute: a

---

[3] Notwithstanding the above, since the Court intends to hold an evidentiary hearing for other purposes, see infra, and likely one or more of the witnesses will have witnessed defendants' interdiction, the defense will be permitted to make a brief inquiry of such witnesses into the conversations that occurred at the time of interdiction. If the result contradicts the record currently before the Court, the Court will allow a motion for reconsideration.

nation's interests are significantly less implicated when a ship is detained and some of its crew members, but not the ship itself, belong to the nation. Moreover, in practice, there is no requirement, nor even any particular likelihood, that a vessel will be captained by an individual from the country where the vessel is registered.

As for the remaining alternative, the parties disagree over what constitutes "flying [a] nation's ensign or flag" under § 70502(e)(2). The Government argues that a piece of fabric must wave in the air; defendants argue that merely displaying the image of a flag is sufficient. Both sides have proffered an array of materials, ranging from historically popular songs to guidance from what claims to be the world's largest boating education organization, the United States Power Squadrons, as bearing on the interpretation of this phrase. But absent ambiguity, the Court is bound by the text of the statute, which the Court finds more than sufficient to determine the meaning of the phrase in the context of the statute as a whole.

On its face, § 70502 is concerned with maritime interactions between the United States and other nations. It repeatedly cites the 1958 Convention on the High Seas, see id. §§ 70502(b)(2)(A), (c)(1)(B), (e)(1), and requires specific procedures to be followed before the power of the United States can be exercised in ways that might conflict with the laws or interests of other nations, see id. §§ 70502(c)(1)(C), (c)(1)(E), (c)(2), (d)(1)(A), (d)(1)(C), (d)(2). But a vessel must give sufficient indication that it is under the protections of another nation before this procedural machinery

engages. This is not to say that the vessel must actually have the protection of another nation as a matter of international law. While § 70502 does sometimes explicitly incorporate the standards of international law, see, e.g., § 70502(e)(1), at other times it does not. Instead, the vessel must put a reasonable United States official on notice that the issues of comity and international relations to which the statute is addressed are implicated by any interference with the vessel. Thus, one of the specified alternative ways of doing so – i.e., "flying [a] nation's ensign or flag" – must at a minimum refer to a display sufficiently prominent as to put a United States official on notice of another country's interests. Id. § 70502(e)(2).

The small emblem at the rear of defendants' boat, even assuming it is an image of an Ecuadorian flag, is not remotely large or prominent enough to put a reasonable official on notice that Ecuador's interests might be affected by the interdiction of defendants' boat. Unlike a prominently displayed flag, the emblem – easily confused with ornamentation – is difficult to see in any waters, not to mention when the small boat is in the large waves of the high seas to which defendants had taken it. The emblem is also very much smaller than the nearby "swoosh" images running the length of the boat's side. Moreover, defendants did not point out the emblem or attempt to use it to communicate to the Coast Guard members that the boat was Ecuadorian. In sum, the Court finds that defendants were not "flying [Ecuador's] ensign or flag" within the meaning of the MDLEA. Id. § 70502(e)(2).

10

Suppression of Post-Arrest Statements: Next, defendants claim
that their post-arrest statements must be suppressed because they were
involuntary and because of the twelve-day delay between their
interdiction and presentment before a magistrate. Defendants argue
that their treatment during their transportation to New York City was
so traumatizing that they were coerced into confessing. The
Government, for its part, denies any mistreatment. The parties agree
that an evidentiary hearing is necessary to resolve these conflicting
accounts, and the Court agrees. The Court will therefore hold an
evidentiary hearing on November 19 at 3:30 pm for these purposes.

The Court can, however, resolve one aspect of defendants'
involuntariness claim on the present record, and the parties need not
address it at the evidentiary hearing. Defendants argue that their
statements were involuntary because they were not informed of their
right to contact the Ecuadorian consulate under Article 36 of the
Vienna Convention on Consular Relations. See Vienna Convention on
Consular Relations, Apr. 24, 1963, [1970] 21 U.S.T. 77. The Supreme
Court has held that violations of Article 36 alone do not warrant
suppression, although they may be considered as part of a wider
voluntariness analysis. See Sanchez-Llamas v. Oregon, 548 U.S. 331,
350 (2006). Defendants do not explain how knowledge of their rights
under Article 36 would have changed their post-arrest statements. For
instance, they do not claim that they would have exercised their
rights under Article 36. They also do not deny that Ecuador does not
require consular notification or that drug trafficking is criminalized

11

in Ecuador. See Gov. Opp. at 24; Gatto Decl. Ex. G. Accordingly, the Court considers the consular notification issue minimally significant within the wider voluntariness analysis.

Sanctions for Spoliation: Finally, defendants ask this Court to impose sanctions on the Government for spoliating evidence by sinking the go-fast. To succeed on their spoliation claim, defendants must show (1) that the go-fast "possessed exculpatory value that was apparent before [it] was destroyed," California v. Trombetta, 467 U.S. 479, 489 (1984), (2) that the boat was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means," id., and (3) that the government acted in bad faith, U.S. v. Barnes, 411 Fed. Appx. 365, 368-69 (2d Cir. 2011). The Court does not reach the first element because it finds defendants fail to satisfy the other two.

Specifically, as to the second element, the Government has produced extensive video and photographic evidence of the go-fast, see Gov. Opp. Ex. C, Ex. E; Prado Decl. Ex. C, such that defendants have already "obtain[ed] comparable evidence." Trombetta, 467 U.S. at 489.

As to the third element, the Government claims that it destroyed the go-fast in good faith because the boat was a hazard to navigation. The video footage shows that the craft was in the open ocean and loaded with drums of fuel that constituted an obvious hazard. See Prado Decl. Ex. C; United States v. Perlaza, 439 F.3d 1149, 1156 (9th

Cir. 2006) (describing destruction of go-fast as "hazard to navigation").[4]

For the foregoing reasons, defendants' motions are hereby denied, except for their motion to suppress their post-arrest statements, as to which an evidentiary hearing will be held on November 19, 2015.

The Clerk of Court is directed to close documents number 17, 22, and 25 on the docket of this case.

SO ORDERED.

Dated:    New York, NY
          October 27, 2015                    _____
                                              JED S. RAKOFF, U.S.D.J.

---

[4] Again, notwithstanding the above, since the Court intends to hold an evidentiary hearing, the defense will be permitted to make a brief inquiry into these events. If the result contradicts the record currently before the Court, the Court will permit a motion for reconsideration.

13